UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| LINDA'S LEATHER, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5:21-CV-00046-CHB-MAS |
| | ) | |
| v. | ) | |
| | ) | |
| VICTOR ZAMBRANO, *et al.*, | ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| Defendants. | ) | |

\*\*\*    \*\*\*    \*\*\*    \*\*\*

This matter is before the Court on Plaintiff Linda's Leather, LLC's Motion for Summary Judgment ("Motion") along with various exhibits. [R. 94]; [R. 95]. Defendant Victor Zambrano responded in opposition, [R. 104], and Plaintiff replied, [R. 107]. Also before the Court are Plaintiff's Combined Motions *in Limine*, [R. 97], Defendant's Motions *in Limine*, [R. 98], Plaintiff's Motion to Strike Defendant's Response to Motion in Limine and its Third Amended Response to Requests for Admission and for Sanctions, [R. 108], and Defendant's Motion for an Order Compelling the Parties to Mediate, [R. 110]. These additional motions are all fully ripe. *See* [R. 105]; [R. 106]; [R. 109]; [R. 112]; [R. 114]; [R. 116]; [R. 117]. For the following reasons, the Court will grant Plaintiff's Motion for Summary Judgment, finding that Defendant has infringed both of Plaintiff's patents, and will deny all other pending motions as moot. Finally, the Court will grant Plaintiff leave to refile a motion specifically addressing the issue of sanctions.

## I.    BACKGROUND

This case centers on the development of anti-cribbing collars and Plaintiff's patents concerning these collars. [R. 1]. Cribbing is a "compulsive behavior in some horses" that involves

a horse "grasping at objects . . . with its incisor teeth and then arching its neck (not downward) and contracting the lower neck muscle to retract the larynx." [R. 94-2, p. 2]. This action is destructive to the object that the horse grasps, but more importantly, it can lead to both mental and physical health issues for the horse, with some horses even needing colic surgery "to repair the damage done from cribbing." *Id.* at 2–3.

The parties' working relationship dates back to the "early 1990s," with Plaintiff[1] having repaired and sold leather products to Defendant including farrier aprons. *Id.* at 2. On January 12, 2015, Defendant came into Plaintiff's store and asked Linda Scott to make anti-cribbing collars based upon a sample collar that he provided. [R. 94-2, p. 2]; [R. 104, p. 2].[2] The sample collar was made by Defendant's uncle and was similar to collars used and sold by Defendant since as early as February 20, 1990. [R. 104, pp. 1–2]; [R. 7-4]; *see also* [R. 7-5 (showing invoices for collars sold by Defendant dating back to as early as June 20, 2013)]. The sample collar was only three inches in width and possessed no securement strap or associated anchoring mechanism outside of the hook-and-loop-fastener-inlaid[3] alligator strap. *See* [R. 94-2, p. 2]; [R. 104, p. 2].

By May of 2015, Scott had developed an experimental version of the collars and began giving these collars to her acquaintances as field trials, [R. 94-2, p. 3]; [R. 107-4], including Defendant, [R. 107-2, p. 5]; [R. 104, p. 2]. From feedback received from these field trials, including feedback from Defendant, Scott learned of two issues with the experimental version: (1) the collars were not firm enough causing bending and weakening over time; and (2) the collars could be easily dislodged by the horse rubbing on things or by other horses pull them off. [R. 94-

---

[1] Linda Scott is the owner of Linda's Leather, LLC. [R. 94-2, p. 1].

[2] Plaintiff refers to the collar given to Scott on this day as "Sample Collar," [R. 94-2, p. 2], and Defendant refers to it as "Zambrano's Gen 1 Anti-Cribbing Collar," [R. 104, p. 2]. The images found at these citations show that these are references to the same collar.

[3] "Hook-and-looper-fastener" refers to the securement method more commonly referred to as "Velcro." [R. 94-1, p. 18].

2, p. 3]; [R. 104, p. 2]. Scott then developed solutions for these issues. For the rigidity issues, Scott tested different webbing patterns for the leather and found a vendor with a webbing technique that guaranteed better and more consistent stiffness in the strapping. [R. 94-2, p. 3]; [R. 107-2, p. 5]. For the dislodging issues, Scott added a secondary securement strap anchored by a "D-ring" that covered and secured the hook-and-loop-fastener-inlaid alligator strap. [R. 94-2, p. 3]; [R. 107-2, p. 5]; [R. 107-4]. By February of 2016, Scott felt that sufficient testing and development had proven the effectiveness of the collars and were ready for sale. [R. 94-2, p. 3]. On February 16, 2016, Plaintiff sold the first units of the final version of these collars[4] to a customer. *Id.*

On February 4, 2016, after Scott expressed concerns of others duplicating the LL Collar, Scott scheduled an appointment with a patent attorney—Mr. Trevor T. Graves with King & Schickli, PLLC—for the purposes of obtaining a patent for the LL Collar. [R. 94-2, p. 4]; [R. 107-2, p. 7]; [R. 107-12, p. 6]. Both Scott and Defendant attended this meeting. [R. 94-2, p. 4]; [R. 107-2, p. 7]; [R. 104, p. 3]; [R. 107-13, p. 10]. After the meeting with Mr. Graves, Scott and Defendant discussed the payment for the legal fees and Defendant offered to pay Mr. Graves's retainer fee. [R. 94-2, p. 5]; [R. 107-2, p. 7]. Accordingly, Defendant had his bookkeeper issue a check for $1,500 payable to "King & Schickli, PLLC" that was later voided. [R. 104, p. 3]; [R. 104-6]. On February 6, 2015, Mr. Graves sent an engagement letter addressed only to Scott. [R. 107-6].[5]

After the meeting with Mr. Graves, Scott and Defendant had a falling out over who the true inventor of the LL Collar was. [R. 94-2, p. 5]. After learning about this dispute, Mr. Graves informed Scott that he could not represent her in filing the patent application for the LL Collar. *Id.*

---

[4] Plaintiff often refers to this collar as the "No-No Collar" or "Scott Collar," which is what Defendant refers to as "Zambrano's Third Generation Collar." *Compare* [R. 94-2, p. 3 (photograph of "final LL Collar")], *with* [R. 104-1, pp. 17–18 (photographs "Third Generation Victor Zambrano Cribbing Collar")]. For sake of clarity, and in light of the Court's ruling, this opinion will refer to this version as the "LL Collar."

[5] The engagement letter is addressed to "Linda Clark." [R. 107-6, p. 1]. There is no dispute that this is referring to Linda Scott. *See* [R. 94-2, p. 5]; [R. 107-12, p. 6].

Scott then engaged with another patent attorney and a provisional application ("'974 Provisional Application") was filed by Scott on April 8, 2016. *Id.*[6] On August 3, 2016, Defendant made his final purchase of the LL Collars from Plaintiff. [R. 7-7]. In August of 2016, Defendant began collaborating with Horse Cents to create a new collar[7] with further reinforced design features. [R. 104, p. 3].

On October 19, 2016, Scott sent cease and desist letters to both Defendant and Horse Cents pertaining to the '974 Patent Application and the Zambrano Collar. [R. 1-3]. On December 9, 2016, Defendant filed a separate patent application for the Zambrano Collar. [R. 104-3]. On January 12, 2017, Scott filed a design patent application. [R. 1-2, p. 2]; [R. 7-2]. On March 28, 2017, Scott filed a utility patent application. [R. 1-1, p. 2]; [R. 7-1]. On September 3, 2019, Scott's utility application ("'129 Utility Patent") issued. [R. 95-4]. On December 10, 2019, Scott's design application ("D'783 Design Patent") issued. [R. 95-3]. On December 13, 2019, Scott sent notice to both Defendant and Horse Cents on the issuance of these patents. [R. 1-4]. On January 31, 2020, Scott assigned all her rights in both patents to Plaintiff. [R. 107-1].

On February 15, 2021, Plaintiff then filed this case alleging patent infringement of both the '129 Utility and D'783 Design Patents. [R. 1]. On December 28, 2021, Defendant's '814 Utility Patent was issued for the Zambrano Collar. [R. 104-3]. On August 1, 2025, Plaintiff filed this Motion for Summary Judgment, [R. 94], along with additional exhibits, [R. 95]. Defendant

---

[6] Despite the fact that Defendant's response claims that Defendant filed the '974 Provisional Application, [R. 104, p. 3], Defendant's Answer indicates that Scott was the one who filed the '974 Provisional Application, [R. 7, p. 15 ("Scott concealed from Zambrano the fact that she had filed the '974 Provisional and the '953 and '698 Applications.")]. It is possible that Defendant's response is referencing a different provisional application that was filed on the same day as Scott's '974 Provisional Application. However, neither Defendant's Answer, [R. 7], Defendant's response, [R. 104], nor any of the exhibits mention, details, or cites to any other provisional application.

[7] Defendant refers to this as Defendant's "GEN4" or "Fourth Generation" Collar. [R. 104, p. 3]; [R. 104-1, pp. 19–20]. The Court will refer to this collar as the "Zambrano Collar."

responded in opposition to the Motion, [R. 104], and Plaintiff replied, [R. 107]. The matter stands submitted for review.

## II.    LEGAL STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Winkler v. Madison Cnty.*, 893 F.3d 877, 890 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 477 U.S. at 248. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.

The moving party bears the initial burden "of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Anderson*, 477 U.S. at 256. The moving party may satisfy that burden by demonstrating an absence of evidence to support an essential element of the non-moving party's case for which the non-moving party bears the burden of proof. *Celotex Corp.*, 477 U.S. at 323. In ruling on a

motion for summary judgment, a court must construe the evidence and draw all reasonable inferences based on the underlying facts in favor of the nonmoving party.

If the moving party presents sufficient evidence to support its claim that no genuine issue of material fact is present in the case, the burden then shifts to the non-moving party to produce "specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial." *Bill Call Ford, Inc. v. Ford Motor Co.*, 48 F.3d 201, 205 (6th Cir. 1995) (citation omitted). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. However, the Court is not obligated to "search the entire record to establish that it is bereft of a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001). Instead, "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Id.* In doing so, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed.  R. Civ. P. 56(c)(1). The non-moving party's evidence must result in more than mere "metaphysical doubt as to the material facts," and "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position" will not suffice for the non-moving party to meet its burden. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citations omitted); *Anderson*, 477 U.S. at 252. Ultimately, there is no genuine issue of material fact and summary judgment is appropriate if the record, taken as a whole and viewed in the light

most favorable to the non-moving party, could not lead the trier of fact to find for the non-moving party. *Matsushita Elec.*, 475 U.S. at 587 (citation omitted).

## III.   ANALYSIS

Plaintiff argues that summary judgment is proper because there is no genuine dispute of material fact and that, as a matter of law, Defendant has infringed both the '129 Utility and D'783 Design Patents through the sale of the Zambrano Collar. [R. 94-1]. In his response, Defendant argues that summary judgment is not proper because "material facts are still genuinely in dispute regarding Zambrano's significant defenses." [R. 104, p. 5]. Defendant makes no attempt to argue against literal infringement of Plaintiff's patents, instead focusing on affirmative defenses showing noninfringement under the reverse doctrine of equivalents, employer rights through an implied-in-fact contract, and shop rights. *See id.* at 4–12. As explained below, the Court agrees with Plaintiff that, based on the factual record, there exists no genuine dispute of a material fact and, even when viewing the facts in the light most favorable to Defendant, Defendant has infringed on both the '129 Utility and D'783 Design Patents through the production and sale of the Zambrano Collar.

### A.   Infringement: D'783 Design Patent

Infringement of a design patent under 35 U.S.C. § 171 is a question of fact that the plaintiff must prove by a preponderance of the evidence. *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1295 (Fed. Cir. 2010) (citing *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1124 (Fed. Cir. 1993)). Determining infringement of a design patent is done through the "eye of an ordinary observer." *FMC Corp. v. Hennessy Indus., Inc.*, 836 F.2d 521, 527 (Fed. Cir. 1987) (quotation marks omitted) (quoting *Gorham Mfg. Co. v. White*, 81 U.S. 511, 528 (1871)). Specifically, the Supreme Court has stated that

> if, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to

deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other.

*Gorham Mfg.*, 81 U.S. at 528. The Federal Circuit has clarified that the "ordinary observer" test established in *Gorham Mfg.* is the sole test for determining infringement of a design patent. *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 678 (Fed. Cir. 2008). The Federal Circuit has further clarified that under this test, "[t]he patentee must establish that an ordinary observer, familiar with the prior art designs, would be deceived into believing that the accused product is the same as the patented design." *Richardson*, 597 F.3d at 1295. Courts must compare the differences in the ornamental features of the patent design and the accused product and determine what impact those differences have on the overall effect of the designs. *Id.* "[M]inor differences between a patented design and an accused article's design cannot, and shall not, prevent a finding of infringement." *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1303 (Fed. Cir. 2010) (alteration in original) (citation and quotation marks omitted).

Cited to within and attached as an exhibit to the Motion, Plaintiff provides the below-shown images of the D'783 Design Patent, the LL Collar (the subject of the patent), and the Zambrano Collar. [R. 94-3]. As Plaintiff correctly states, the "Zambrano Collar includes all ornamental features covered by the D'783 Patent and that it has no other features to distinguish it from the D'783 Patent." [R. 94-1, p. 8]. Further, Plaintiff provides through the sworn declaration of Scott that she has "had numerous clients and other persons ask me about the source of infringing Zambrano Collars and be confused thinking they were made and sold by me. These individuals expressed to me that they could not tell the difference between my collars and the Zambrano Collars." [R. 94-2, p. 11].



Linda's Leather Collar



Zambrano Collar





In response, Defendant makes no attempt to argue that an ordinary consumer would not be confused, *see generally* [R. 104], and the Court fails to see how he could. These detailed comparisons of the D'783 Design Patent as referenced in Fig. 1 and Fig. 2 above, *see* [R. 1-2, p. 45], and the Zambrano Collar suggest that an ordinary observer, familiar with the prior art designs, would be deceived into believing that the accused product is the same as the patented design. *See Richardson*, 597 F.3d at 1295; *Crocs, Inc.*, 598 F.3d at 1306. In each comparison, the

Zambrano Collar is virtually indistinguishable from the D'783 Design Patent reflected in Fig. 1, Fig. 2, and the LL Collar as shown above. The Court itself struggled to identify any differences between the D'783 Design Patent and the Zambrano Collar. It is doubtful that an ordinary observer could notice any differences without very careful and prolonged effort. Accordingly, Plaintiff has successfully shown that there is no genuine dispute of a material fact as to infringement under the D'783 Design Patent and that the Zambrano Collar literally infringes on said patent.

### B.  Infringement: '129 Utility Patent

The plaintiff bears the burden of proving infringement of a utility patent by a preponderance of the evidence. *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1123 (Fed. Cir. 1985) (citations omitted). Determining whether the claims of a utility patent have been literally infringed is a two-step process. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995), *aff'd,* 517 U.S. 370 (1996). "The first step is determining the meaning and scope of the patent claims asserted to be infringed. The second step is comparing the properly construed claims to the device accused of infringing." *Id.* (citation omitted); *see also Lantech, Inc. v. Keip Mach. Co.*, 32 F.3d 542, 546 (Fed. Cir. 1994) (citation omitted). "The first is a question of law, to be determined by the court, construing the letters-patent, and the description of the invention and specification of claim annexed to them. The second is a question of fact, to be submitted to a jury." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384 (1996) (citations omitted). "Where the facts underlying the issue of infringement are undisputed, the function of applying claims to the accused device is the province of the district court." *Martin v. Barber*, 755 F.2d 1564, 1567 (Fed. Cir. 1985); *see also Roche Palo Alto LLC v. Apotex, Inc.*, 531 F.3d 1372, 1381 (Fed. Cir. 2008) (affirming the district court's grant of Plaintiff's motion for summary judgment on the issue of infringement).

## 1.    Step One: Claim Construction

It is a "bedrock principle" of patent law that, through claim construction, both the invention and the scope of a patentee's right of exclusion are defined by the patent's claims. *Phillips v. AWH Corporation*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). Claim terms should be construed according to "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1313.

The parties do not dispute the meaning of any of the claim terms with respect to the '129 Utility Patent. [R. 40, p. 3 ("[T]he Parties have not identified any claim terms to which they do not agree on the meanings.")]. Thus, the Court will refer to the definitions provided in the Joint Claim Construction Statement, *id.* at 2–3, and apply the ordinary meaning to any undefined terms. *Phillips*, 415 F.3d at 1313; *see also Baxter Healthcare Corp. v. Spectramed, Inc.*, 49 F.3d 1575, 1582–83 (Fed. Cir. 1995) (moving directly to step two of the analysis because "the parties do not dispute the meaning of the claim terms," and thus, "[t]he question instead turns on whether the accused devices infringe the claims as written").

## 2.    Step Two: Application to Accused Device

Literal infringement requires that the accused product contains every limitation of the asserted claim. *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1105 (Fed. Cir. 1996) (citing *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991)). "The absence of even a single limitation . . . precludes a finding of literal infringement." *Kahn v. General Motors Corp.*, 135 F.3d 1472, 1477 (Fed. Cir. 1998).

Plaintiff argues that the Zambrano Collar literally infringes on the '129 Utility Patent through Independent Claims 1, 2, 3, 4, 6, 7, 10, and 11 of said patent. [R. 94-1, pp. 10–24]. Taking

the language from Independent Claim 1, [R. 1-1, p. 13], and their agreed-upon meanings from the Joint Claim Construction Statement, [R. 40], Plaintiff demonstrates how the Zambrano Collar is (1) a "collar," that has (2) a "main collar strip" with (3) an "alligator flap" that has a (4) "hinge end" and a (5) "free end" and with the main collar strip possessing (6) "hook-and-loop fastener material" and a (7) "securement strap." [R. 94-1, pp. 10–20]; *see also* [R. 1-1, p. 13]; [R. 40]. Plaintiff further demonstrates that, as covered by Independent Claim 2, the Zambrano Collar uses a (1) "ring" on the outside of the main collar strip that receives the (2) "securement strap" to secure the (3) "alligator flap." [R. 94-1, pp. 20–21]; *see also* [R. 1-1, p. 13]; [R. 40]. For Independent Claims 3 and 10, Plaintiff demonstrates that the Zambrano Collar has a (1) "securement strap" that is a (2) "second width that is less than the first width." [R. 94-1, pp. 21–23]; *see also* [R. 1-1, p. 13]; [R. 40]. For Independent Claims 4 and 11, Plaintiff demonstrates that the Zambrano Collar has a (1) "securement strap" that (2) "has an outer surface with hook and looper fastener material," and (3) "secures to itself" by said material. [R. 94-1, p. 23]; *see also* [R. 1-1, p. 13]; [R. 40]. For Independent Claims 6 and 7, Plaintiff demonstrates that the Zambrano Collar is a (1) "collar" that has a (2) "main collar strip" that is (3) sized and shaped to serve as a cribbing collar for a horse." [R. 94-1, pp. 23–24]; *see also* [R. 1-1, p. 13]; [R. 40].

Plaintiff further argues that Defendant has effectively conceded infringement through his responses during discovery. [R. 94-1, pp. 24–27]. Plaintiff cites to Defendant's responses to interrogatories, [R. 95-11], requests to produce documents, [R. 95-12], and requests for admission, [R. 95-10]. As Plaintiff points out, Defendant provides no meaningful response to the issue of literal infringement based on the '129 Utility Patent claims. [R. 94-1, pp. 24–26]. Further, Defendant makes no attempt to raise any argument against literal infringement based on the claims in his response to the present Motion, much less point the Court to record evidence raising a

material issue of fact. *See* [R. 104]. Plaintiff has demonstrated that the Zambrano Collar contains every limitation of the asserted claims. *See Maxwell*, 86 F.3d at 1105. Without any further contest from Defendant on literal infringement based on the claims, and given the clear evidence in the record supporting literal infringement, Defendant has failed to raise a genuine issue of material fact on the issue of literal infringement under the '129 Utility Patent claims.

### 3.    Relevance of Defendant's '814 Utility Patent

In his response, Defendant repeatedly references obtaining his '814 Utility Patent and overcoming an obviousness rejection under 35 U.S.C. § 103. *See, e.g.*, [R. 104, pp. 3–5]. To the extent that Defendant attempts to use this as evidence of noninfringement of Plaintiff's patents, that argument is unavailing. A patent confers only the negative right to exclude, not the affirmative right to practice. *High Point SARL v. T-Mobile USA, Inc.*, 640 F. App'x 917, 928 (Fed. Cir. 2016) (citing *TransCore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271, 1275 (Fed. Cir. 2009)). It is among the "clearly established principles" of patent law that "the government did not confer on the patentee the right himself to make, use or vend his own invention" and "all that the government conferred by the patent was the right to exclude others from making, using or vending his invention." *Crown Die & Tool Co. v. Nye Tool & Mach. Works*, 261 U.S. 24, 35 (1923); *see also Bauer & Cie v. O'Donnell*, 229 U.S. 1, 10 (1913) ("The right to make, use, and sell an invented article is not derived from the patent law. . . . The [patent statute] secured to the inventor the *exclusive* right to make, use, and vend the thing patented, and consequently to prevent others from exercising like privileges without the consent of the patentee." (alteration in original) (citation omitted)); *Cont'l Paper Bag Co. v. E. Paper Bag Co.*, 210 U.S. 405, 425 (1908) ("The franchise which the patent grants consists altogether in the right to exclude everyone from making, using, or vending the thing patented without the permission of the patentee. This is all that he obtains by the

patent." (citation and quotation marks omitted)); *Dawson Chem. Co. v. Rohm & Haas Co.*, 448 U.S. 176, 215 (1980) (discussing the "long-settled view that the essence of a patent grant is the right to exclude others from profiting by the patented invention").

Consequently, a patentee may be prevented from practicing his own patent by another's patent. *See Glaxo Wellcome, Inc. v. Andrx Pharms., Inc.*, 344 F.3d 1226, 1233 (Fed. Cir. 2003) ("[S]eparate patentability does not automatically negate infringement."); *Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*, 750 F.2d 1569, 1580 (Fed. Cir. 1984) ("[W]here defendant has appropriated the material features of the patent in suit, infringement will be found, 'even when those features have been supplemented and modified to such an extent that the defendant may be entitled to a patent for the improvement.'" (citation omitted)); *Sanitary Refrigerator Co. v. Winters*, 280 U.S. 30, 43 (1929) ("Nor is the infringement avoided, under the controlling weight of the undisputed facts, by any presumptive validity that may attach to the Schrader patent by reason of its issuance after the Winters and Crampton patent."). Quoting the Sixth Circuit, the Federal Circuit has stated that

> A patent is not the grant of a right to make or use or sell. It does not, directly or indirectly, imply any such right. It grants only the right to exclude others. The supposition that a right to make is created by the patent grant is obviously inconsistent with the established distinctions between generic and specific patents, and with the well-known fact that a very considerable portion of the patents granted are in a field covered by a former relatively generic or basic patent, are tributary to such earlier patent, and cannot be practiced unless by license thereunder.

> Another reason sometimes advanced for supposing that the structure of the second does not infringe the claim of the first patent is that the Patent Office has declared that a patentable difference exists. The premise is sound, but not the conclusion. In examining the second application, the Patent Office has no concern with the scope of the claim of the first, and does not and must not pay any attention thereto. It is concerned only with the early disclosure by the specification and drawings. Patentable difference does not of itself tend to negat[e] infringement. It may just as well be based upon infringement, plus improvement; and improvement may lie in addition, simplification, or variance.

- 14 -

*Atlas Powder*, 750 F.2d at 1580–81 (quoting *Herman v. Youngstown Car Mfg. Co.*, 191 F. 579, 584–85 (6th Cir. 1911)). "Whether improvement or modification avoids infringement depends on the particular facts." *Glaxo Wellcome*, 344 F.3d at 1233–34 (citing *Nat'l Presto Indus., Inc. v. West Bend Co.*, 76 F.3d 1185, 1191–92 (Fed. Cir. 1996)).

Accordingly, the fact that Defendant has obtained a patent, [R. 104-3], is of little relevance as to whether the Zambrano Collar that is the subject of said patent infringes upon Plaintiff's patents. Given that Plaintiff has sufficiently established literal infringement of both the '129 Utility and D'783 Design Patents, and Defendant has made no attempt to dispute literal infringement in his response—but has instead argued for noninfringement based on affirmative defenses—the Court finds that the Zambrano Collar literally infringes both the '129 Utility and D'783 Design Patents.

### 4.    Reverse Doctrine of Equivalents Defense

Defendant contends that summary judgment on infringement is inappropriate because he has raised a triable issue of fact as to whether the reverse doctrine of equivalents defense precludes a finding of infringement related to the '129 Utility Patent. [R. 104, pp. 5–7]. The Court disagrees and finds that Defendant has failed to make a prima facie case of noninfringement under the reverse doctrine of equivalents.[8] *See Roche*, 531 F.3d at 1377–79.

The reverse doctrine of equivalents is an equitable doctrine designed "to prevent unwarranted extension of the claims beyond a fair scope of the patentee's invention." *Id.* (quoting *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1581 (Fed. Cir. 1991)). The Supreme Court has stated that

> where a device is so far changed in principle from a patented article that it performs *the same or similar function in a substantially different way*, but nevertheless falls

---

[8] Defendant only argues for the reverse doctrine of equivalents in reference to the '129 Utility Patent. *See* [R. 104, pp. 5–7].

within the literal words of the claim, the [reverse] doctrine of equivalents may be used to restrict the claim and defeat the patentee's action for infringement.

*Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608–09 (1950) (emphasis added)

(citing *Westinghouse v. Boyden Power Brake Co.*, 170 U.S. 537, 568 (1898)). Applying this test,

other courts have further stated that

> [f]rom this enunciation, it is apparent that the reverse doctrine of equivalents requires: (1) a comparison between the patent claims and a device; and (2) that the device in question not only meets the patent claims, but also reflects some additional features or elements that *cause it to perform its function in a substantially different way from the patented article*.

*Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 533 F. Supp. 2d 243, 245 (D. Mass.

2008) (emphasis added); *Aviation Clean Air, LLC v. Ionic Air Care, Inc.*, No. 3:21-CV-

219-TCB, 2025 WL 1421484, at *11 (N.D. Ga. Jan. 17, 2025) (quoting *Depuy Spine*, 533

F. Supp. 2d at 245). Stated another way, the reverse doctrine of equivalents protects the

accused infringer from literal infringement when the accused device "has been so changed

that it is no longer the same invention." *Del Mar Avionics, Inc. v. Quinton Instrument Co.*,

836 F.2d 1320, 1325 (Fed. Cir. 1987) (citation omitted); *Aviation Clean Air*, 2025 WL

1421484, at *11 (quoting *Del Mar Avionics*, 836 F.2d at 1325).

While the plaintiff bears the initial burden of establishing infringement, if the plaintiff

establishes literal infringement, then the burden shifts to the defendant to set forth a prima facie

case of noninfringement under the reverse doctrine of equivalents. *Roche*, 531 F.3d at 1377–78

(citing *SRI Int'l*, 775 F.2d at 1123–24). If the defendant is successful in making a prima facie case,

then the plaintiff must rebut that prima facie case. *Id.* at 1378 (citing *SRI Int'l*, 775 F.2d at 1124);

*see also Steuben Foods, Inc. v. Shibuya Hoppmann Corp.*, 127 F.4th 348, 356 (Fed. Cir. 2025)

(detailing the same burden-shifting framework). The reverse doctrine of equivalents is "rarely

applied," and the Federal Circuit has "never affirmed a decision finding noninfringement based on

the reverse doctrine of equivalents." *Steuben Foods*, 127 F.4th at 356–57 (quotation marks omitted) (quoting *Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*, 279 F.3d 1357, 1368 (Fed. Cir. 2002)).

To make a prima facie case under the reverse doctrine of equivalents, the defendant must first establish the "principle" of the patent. *Roche*, 531 F.3d at 1378–79 (citation omitted). Taken from the language of "so far changed in *principle*" from *Graver Tank*, 339 U.S. at 608 (emphasis added), the Federal Circuit has clarified that the "principle" of a patent is the "equitable scope of the claims" as determined in light of "the specification, the prosecution history, and the prior art." *Scripps Clinic*, 927 F.2d at 1581, *overruled on other grounds by*, *Abbott Lab. v. Sandoz, Inc.*, 566 F.3d 1282 (Fed. Cir. 2009); *Roche*, 531 F.3d at 1378. In *Roche*, the Federal Circuit rejected the defendant's characterization of the principle of the patent at issue because the defendant failed to "properly support" the principle that Defendant had alleged for the patent. 531 F.3d at 1378–79. The Federal Circuit reasoned that the defendant failed because he solely relied on a declaration of an expert instead of the "specification, prosecution history, and the prior art" of the patent and its claims. *Id.*

The Federal Circuit has clarified that courts evaluating a defense under the reverse doctrine of equivalents may employ analysis from the doctrine of equivalents since the two are the "opposite sides of the same coin." *SRI Int'l*, 775 F.2d at 1125. In discussing the interplay between these two doctrines, the Federal Circuit has stated that

> the law acknowledges that one may appropriate another's patented contribution not only with a product precisely described in a patent claim (literal infringement) but also with a product that is not quite so described but is in fact "substantially the same thing, used in *substantially the same* way, to achieve substantially the same result" (doctrine of equivalents). The law also acknowledges that one may only appear to have appropriated the patented contribution, when a product precisely described in a patent claim is in *fact* "so *far* changed in principle" that it performs in a "*substantially different* way" and is not therefore an appropriation (reverse

- 17 -

doctrine of equivalents). One who takes a claimed structure and merely uses it in a way that differs from that in which a specification-described embodiment uses it, does not thereby escape infringement.

* * * *

Equivalence and non-equivalence, as the terms indicate, are but opposite sides of the same coin. In determining each, a court must say whether an accused device operates in substantially the same way (equivalence) or in a substantially different way (non-equivalence). The doctrine of equivalents may be employed, as was said in Graver, to expand or *restrict* a claim.

Indeed, the Supreme Court in *Graver Tank*, *supra*, and one of our predecessor courts . . . said "the *doctrine of equivalents* may be used to restrict the claim," and this court . . . in rejecting appellant's argument on the reverse doctrine of equivalents, employed the classic statement of equivalence, saying: "the Berlyn devices do the same work, in substantially the same way, to accomplish substantially the same result."

*Id.* at 1123, 1125 (alteration in original) (citations omitted). Accordingly, even in the absence of literal infringement, the doctrine of equivalents can "expand" the claim because it "allows a finding of infringement when the accused device and the claimed invention perform *substantially the same function in substantially the same way* to yield substantially the same result." *Martin*, 755 F.2d at 1567 (citing *Graver Tank*, 339 U.S. at 608). The *SRI* court likewise explained that this analysis can be employed "to restrict the claim" under a reverse doctrine of equivalents analysis. *SRI Int'l*, 775 F.2d at 1125 (quoting *Graver Tank*, 339 U.S. at 608).

Here, as detailed above, Plaintiff has met its burden of establishing infringement of the '129 Utility Patent. Accordingly, the burden is on Defendant to make a prima facie case under the reverse doctrine of equivalents to genuinely raise this as an issue of material fact. *See Roche*, 531 F.3d at 1377–79. However, Defendant has made no genuine attempt to satisfy this burden. Defendant dedicates less than three pages of his response to this issue, with one full page used for images of a drawing used in his '814 Utility Patent and an image of the Zambrano Collar. [R. 104, pp. 5–7]. Defendant first argues that the LL Collar fails to maintain shape and that he solved this problem when designing the Zambrano Collar by extending the reinforced section of the collar

- 18 -

over the joint. *Id.* at 5. Defendant further states that this solution is what the patent office considered when issuing his patent. *Id.* Defendant then states—in a conclusory manner—that "[n]ot only does Zambrano's collar work differently, but it works in a way that is significantly different from the '129 Patent." *Id.* at 7. Defendant provides no support for this baseless claim, instead summarily stating that because he has raised this defense, he has raised a genuine issue of material fact making summary judgment inappropriate at this stage. *Id.* (citing *SRI Int'l*, 775 F.2d at 1125).

Defendant's argument utterly fails to make a prima facie case for noninfringement under the reverse doctrine of equivalents. *See Roche*, 531 F.3d at 1377–79; *Celotex Corp.*, 477 U.S. at 323–24 ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose."). Notably, Defendant makes no attempt to distinguish the design or functioning of his accused Zambrano Collar from the "specification, prosecution history, and the prior art" of the claims in Plaintiff's '129 Utility Patent. *See Roche*, 531 F.3d at 1378–79. Unlike the defendant in *Roche*, Defendant fails to even articulate or assert a "principle" of Plaintiff's '129 Utility Patent that the Court could analyze his defense against, much less articulate—with reference to record evidence—how the Zambrano Collar functions in a "substantially different way." *See id.*

However, even if Defendant had actually articulated the principle of Plaintiff's '129 Utility Patent, he would still fail to establish a prima facie case of noninfringement under this defense. As mentioned, Defendant appears to base his reverse doctrine of equivalents argument on the claim that he changed the design by extending the rigid portion of the main collar strip past the joint, thus allowing it to better maintain shape. *See* [R. 104, pp. 5–7]. Even accepting Defendant's claim

that the LL Collar fails to maintain its shape, Defendant's solution of extending the rigid portion of the main collar strip past the joint did not change the way that the collar functions; at most it simply improved its performance. The Zambrano Collar does not perform its function in a manner substantially different than the '129 Utility Patent.

More to the point, as Plaintiff points out in the reply, the '129 Utility Patent's claims do not specify the maintenance of a particular shape. [R. 107, p. 5]; [R. 1-1, p. 13]; *see also* [R. 40 (Joint Claim Construction Statement)]. As Plaintiff correctly notes, "[t]he recited claim limitations are agnostic as to maintaining a 'shape' and do not exclude Zambrano's purported solution." [R. 107, p. 5]. Further, the '129 Utility Patent's claims do not recite limitations that are substantially different from Zambrano's purported "solution" or "improvement." Instead, Defendant's generic and undeveloped argument under the reverse doctrine of equivalents is untethered from the claim language because he wholly fails to apply the test and describe—using the language from the claims—how the Zambrano Collar performs the same function in a substantially different way. *See* [R. 104].

This point is reinforced by looking at the Zambrano Collar under a doctrine-of-equivalents analysis. Even if there was no literal infringement, the Zambrano Collar would infringe the '129 Utility Patent because the collar and its alleged improved rigidity still perform the exact same function in the exact same way as the '129 Utility Patent. *See Atlas Powder*, 750 F.2d at 1580–81. Even if the LL Collar performs poorly during use, as alleged by Defendant through sworn declarations by two of his customers, [R. 104-1, pp. 3–4]; [R. 104-2, pp. 3–4], Defendant has failed to demonstrate how the Zambrano Collar is so different in principle that it functions in a manner substantially different from the '129 Utility Patent and the scope of its claims.

- 20 -

Both the LL Collar and the Zambrano Collar serve the same function: to prevent horses from cribbing. They both seek to accomplish this the same way through a rigid portion of the collar secured by a hook-and-loop-fastener-inlaid alligator strap, which is then protected from dislodgment through a secondary securement strap that is fed through and anchored to the collar by a metal ring. [R. 94-3]. The only notable difference is that Defendant's patent and the Zambrano Collar extend the rigid portion of the collar past the joint, whereas Plaintiff's patent has the rigid portion of the collar end at the joint. *Compare* [R. 104-3 (Defendant's patent)], *and* [R. 94-3 (images of Zambrano Collar)], *with* [R. 1-1 (Plaintiff's '129 Utility Patent)]; *and* [R. 40 (Joint Claim Construction Statement)].[9] Even when viewing in the light most favorable to the Defendant and accepting as true the assertion that the LL Collar fails to maintain a certain shape and that the added feature in the Zambrano Collar solves that issue, this does not mean that the Zambrano Collar functions in a "substantially different way." *See Graver Tank*, 339 U.S. at 608–09. This is simply an improvement in the same function and through the same way as covered by Plaintiff's '129 Utility Patent. The Zambrano Collar does "the same work, in substantially the same way, to accomplish substantially the same result" as the collar detailed in the claims of Plaintiff's '129 Utility Patent. *See SRI Int'l*, 775 F.2d at 1125 (quotation marks omitted) (quoting *Kalman v. Kimberly-Clark Corp.*, 713 F.2d 760, 771 (Fed. Cir. 1983).

Regardless of the likely fruitlessness of that argument, Defendant fails to even properly raise it. *See* [R. 104]. Because Defendant has failed to even attempt to articulate the principle for the '129 Utility Patent, has provided no support for the bare assertion that the Zambrano Collar functions substantially different than the '129 Utility Patent, and has failed to make any argument

---

[9] Defendant's response also mentions the LL Collar's use of a rivet to anchor the loop that the secondary securement strap is fed through. *See, e.g.*, [R. 104, pp. 2–3]. The Zambrano Collar does not use this securement method. *See* [R. 104-3]; [R. 94-3]. However, since the claim limitations of the '129 Utility Patent make no mention of the use of a rivet, the '129 Utility Patent is not limited to that specific securement method. *See* [R. 1-1, p. 13].

relating to the "specification, prosecution history, and the prior art" of the '129 Utility Patent and its claims, Defendant has failed to make a prima facie case for noninfringement under the reverse doctrine of equivalents. Consequently, Defendant has failed to raise a genuine dispute of a material fact as to this defense. *See Roche*, 531 F.3d at 1377–79.

### C.    Additional Defenses Applying to Both Patents

In his response, Defendant provides two other defenses against infringement of Plaintiff's patents: (1) that Defendant possesses employer rights in the patents through an implied-in-fact contract, and (2) that Defendant possesses an implied license created by shop right. [R. 104, pp. 7–10]. Defendant's arguments are supported principally through the allegations made in his response brief, only citing the record twice. *See id.* As detailed below, the Court is unpersuaded by Defendant's largely unsupported allegations and finds that the facts in the record that he cites do not raise a genuine dispute of material fact on these matters.

### 1.    Employer Rights through an Implied-In-Fact Contract

Defendant first argues that the facts of this case support the finding that he possesses employer rights in Plaintiff's patents because he and Scott had an implied-in-fact contract. In discussing employer rights to patents, the Federal Circuit has stated:

> The general rule is that an individual owns the patent rights to the subject matter of which he is an inventor, even though he conceived it or reduced it to practice in the course of his employment. There are two exceptions to this rule: first, an employer owns an employee's invention if the employee is a party to an express contract to that effect; second, where an employee is hired to invent something or solve a particular problem, the property of the invention related to this effort may belong to the employer. Both exceptions are firmly grounded in the principles of contract law that allow parties to freely structure their transactions and obtain the benefit of any bargains reached.

*Banks v. Unisys Corp.*, 228 F.3d 1357, 1359 (Fed. Cir. 2000) (citations omitted). Defendant does not allege that there was any written contract or an express agreement between the parties as to

patent rights. *See* [R. 104, pp. 7–10]. Instead, Defendant focuses his defense on the second exception mentioned in *Banks* based on an alleged implied-in-fact contract. *See id.*

"An implied-in-fact contract is an agreement founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Banks*, 228 F.3d at 1359 (quotation marks omitted) (citing *Teets v. Chromalloy Gas Turbine Corp.*, 83 F.3d 403, 407 (Fed. Cir. 1996)). Courts applying the "employed to invent" exception "must examine the employment relationship at the time of the inventive work to determine if the parties entered an implied-in-fact contract to assign patent rights." *Banks*, 228 F.3d at 1359 (quoting *Teets*, 83 F.3d at 407).

"[S]tate contract principles provide the rules for identifying and enforcing implied-in-fact contracts." *Teets*, 83 F.3d at 407 (citing *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938)). The Kentucky Supreme Court has stated that

> a contract may be inferred wholly or partly from such conduct as justifies the promisee in understanding that the promisor intended to make a promise. *To constitute such a contract there must, of course, be a mutual assent by the parties— a meeting of minds—and also an intentional manifestation of such assent.* Such manifestation may consist wholly or partly of acts, other than written or spoken words.

*Furtula v. Univ. of Kentucky*, 438 S.W.3d 303, 308 (Ky. 2014) (alteration in original) (citing *Kellum v. Browning's Adm'r*, 21 S.W.2d 459, 463 (1929)), *modified,* June 23, 2014. In finding that an implied-in-fact contract was not created, the Kentucky Supreme Court has further stated that

> [t]he conditions and circumstances were not such as . . . show a mutual intention to contract. There is no disclosure of facts from which it may be inferred there was a meeting of minds or an expectation that one party would receive payment for the services rendered and the other would pay for services accepted.

*Johnson's Adm'r v. Johnson*, 244 S.W.2d 969, 972 (Ky. 1951). Lastly, as the United States Supreme Court has noted, an employee is one who works "in the service of another person (the employer) under an express or implied contract of hire, under which the employer has the right to control the details of work performance." *New Prime Inc. v. Oliveira*, 586 U.S. 105, 116–17 (2019) (quotation marks omitted) (quoting *Black's Law Dictionary* 639 (10th ed. 2014)).

To support his claim of employer rights through an implied-in-fact contract, Defendant makes various claims. First, without making any cite to the record, he states that he "hired" and "contract[ed]" with Scott to "produce prototypes" of the collars. [R. 104, pp. 9–10]. He repeatedly claims that he paid for Scott's "time and material." *Id.* at 8, 10. To support this claim, Defendant cites to a list of transactions between Plaintiff and Defendant between the dates of January 1, 2015, and August 3, 2016. [R. 104-5]. The list of transactions show fixed prices, quantities, payment totals, and dates of these collar purchases. *Id.* It makes no mention of time, labor costs, salary or wages, or materials used by Plaintiff in making or developing the collars. On its own, this piece of evidence not only fails to support Defendant's characterization, it directly contradicts that characterization.

Further, in reply, Plaintiff provides the individual invoices for most of these transactions. [R. 107-11, pp. 8–35]. Plaintiff's exhibit shows that all of these transactions between Defendant and Plaintiff were for set prices, with totals varying only based upon quantities. *See id.* In fact, most of the invoices, titled with the vendor name "Linda's Leather" and its business address, explicitly state that the collars were sold to Defendant "for resale." *See id.* Not a single invoice makes any mention of Plaintiff's time, labor, salary, wages, or expenses from materials as would be expected based upon Defendant's characterization. *See id.* Instead, Plaintiff provides thirteen pages of bank statements, invoices, and receipts all showing that Plaintiff paid for the materials

during the development of the collars. [R. 107-3]. Plaintiff, through the sworn declaration of Scott, states that Defendant never compensated her for these materials. [R. 107-2, pp. 3–4]. On top of all of that, Defendant, during his protest of the '974 Provisional Application, [R. 107-10, pp. 3–6], and his bookkeeper during her deposition, [R. 107-7, p. 19], both characterize these transactions as "purchases" with no mention to time, materials, or anything else that would indicate an employment relationship. In fact, through her sworn supplemental declaration, Scott further states that Defendant "never paid me a salary or for my time and materials and there was never an agreement (written, oral, or otherwise) to enter into any kind of business relationship." [R. 107-2, p. 8]. Simply put, all the evidence in the record shows that Defendant did not pay for Plaintiff's time and materials, but instead simply purchased these collars like any customer.[10]

Defendant also claims that he "had an investment in the endeavor" of these collars. [R. 104, p. 8]. In support, Defendant cites only to the voided check for $1,500 payable to "King & Schickli, PLLC" that was meant to cover Mr. Graves's retainer fee. *Id.*; *see also* [R. 104-6 (image of voided check)]. The check is devoid of context, and outside of Defendant's unsupported assertions in his response stating that the check was for him to obtain the patent in the collars, [R. 104, p. 3], Defendant provides no sworn declaration or other evidence for the Court to better understand the context of the check. On the other hand, Plaintiff offers the sworn declaration of Scott to explain the context in which Defendant, through his bookkeeper, drafted this check. [R. 94-2, pp. 4–5]. Notably, Linda Scott states that "I expressed my concerns that this was an expensive undertaking. Zambrano suggested for him to provide the attorney fee retainer since I needed to spend at least $3,000.00 on supplies and buy a new $5,000.00 sewing machine for better production." *Id.* This is

---

[10] Plaintiff, through Scott's supplemental declaration, states that Defendant purchased the collars "as any other customer except I offered to sell my collars to him at a lower cost for his resale to his farrier customers." [R. 107-2, pp. 2–3]. This difference is immaterial as to whether Defendant was an employer. All that it shows is that he was a customer sold to at a lower price.

not only a plausible telling of the facts, but also the only evidence of record in which the Court can consider the context of the drafting of this check. Consequently, this check does not support Defendant's claim that he "had an investment in the endeavor" of these collars. [R. 104, p. 8].

Outside of the list of transactions—which reflect purchases of collars and not an implied employment relationship—and the voided check, neither of which support his claim, Defendant provides no other evidence of record supporting the characterization that he "hired" Plaintiff. *See* [R. 104, pp. 7–10]. On the other hand, Plaintiff provides the sworn declaration from Scott as to the nature of the meeting on January 12, 2015. [R. 94-2, p. 2]. Specifically, Scott states that Defendant, after showing and giving the sample collar to her, "indicated that if I could make an effective replacement cribbing collar, he would buy them from me as a new source." *Id.* In Scott's supplemental declaration, she further states that Defendant "simply agreed to buy collars from me for a price, and I agreed to sell my collar products to him for a price." [R. 107-2, p. 8]. Further, Scott also explicitly states that "Zambrano and I never entered into a written contract, never entered into an oral contract, I never served as an employee or a contractor to Zambrano, and there was never a 'meeting of the minds' as to any business arrangement related to developing and producing collars." *Id.* Plaintiff's characterization of their professional arrangement is overwhelmingly supported by the evidence in the record. *See* [R. 94-2, p. 2 (Scott's declaration)]; [R. 107-2, p. 8 (Scott's supplemental declaration)]; [R. 104-5 (list of transactions between Plaintiff and Defendant)]; [R. 107-11 (invoices for transactions between Plaintiff and Defendant)]; [R. 107-3 (receipts and bank transactions for materials paid by Plaintiff)]; [R. 107-7, p. 19 (Defendant's bookkeeper's testimony about purchases)]; [R. 107-10, pp. 3–6 (Defendant's characterization of purchases)].

Defendant claims that "Scott's actions clearly support the existence of an implied-in-fact contract to assign her patent rights, if any, to Zambrano." [R. 104, p. 10]. He states that "[n]eedless to say, Linda Scott's silence as to Zambrano's expectation of rights led him to infer her assent." *Id.* at 9. The Court disagrees. What Defendant inferred from Scott's actions is only relevant if those inferences were "justified." *See Furtula*, 438 S.W.3d at 308. The "clear expectations" that Defendant argues existed are simply not supported by the factual record. Scott and Defendant had no written or oral contract. [R. 107-2, p. 8]. Defendant never paid for Scott's time and materials but instead purchased the collars like any customer. [R. 104-5]; [R. 107-11]; [R. 107-3]. Lastly, the context of the meeting with Mr. Graves that the voided check was meant to pay for shows that Scott was the one who justifiably expected to own the patent. Scott was the one who set up and prepared for the meeting. [R. 94-2, p. 4]; [R. 107-12, p. 6]. While Mr. Graves noted in his deposition that he had no memory of who the inventor was said to be, [R. 107-12, pp. 10–11], he also stated that he assumed that Scott would be the client because she was the one who scheduled the appointment, *id.* at 7–8. Lastly, after the meeting was finished, Mr. Graves sent the engagement letter addressed only to Scott. [R. 107-6]. Mr. Graves noted in his deposition that he usually only sends letters of engagement to the prospective client. [R. 107-12, pp. 12–13]. Any expectation that Defendant had in receiving the patent rights for these collars were unreasonable, unjustified, and unsupported by the facts in the record.

Further, the fact that the parties had their falling out shortly after this meeting and discussing inventorship demonstrates that there was never a meeting of minds on this matter. [R. 94-2, p. 5]. Simply put, there is no genuine dispute that the parties ever had an implied-in-fact contract as to an employment relationship between Scott and Defendant or to otherwise "assign" or "transfer" the patent rights to Defendant. *See* [R. 104, p. 10]; *Furtula*, 438 S.W.3d at 308; *Banks*,

228 F.3d at 1359 (reversing the district court's grant of summary judgment on the existence of an implied-in-fact contract because the plaintiff's conduct in refusing to sign over his inventive rights to his employer was evidence that there was "no meeting of the minds"); *REXA, Inc. v. Chester*, 42 F.4th 652, 667–70 (7th Cir. 2022) (affirming the district court's grant of summary judgment that no implied-in-fact contract existed on a similar standard under Massachusetts law because the employee "was not specifically directed to develop" the subject of the patent); *Farmers Edge Inc. v. Farmobile, LLC*, 970 F.3d 1027, 1032 (8th Cir. 2020) ("To prevail on its hired-to-invent theory based on an implied contract, [the party asserting this claim] must show that the employees were given a certain amount of specific direction from their employer." (citations omitted)).

Defendant raises the defense that he was entitled to employer rights through an implied-in-fact contract principally through unsupported assertions in his response. *See* [R. 104]. The little evidence that he does cite in the record either does not support his assertions or directly contradicts them. Consequently, Defendant has failed to raise any genuine dispute of a material fact concerning the alleged existence of an implied-in-fact contract, and the Court is overwhelmingly convinced that no such contract was ever created.

### 2.    Implied License by Shop Right

The Federal Circuit has stated that "shop right" is a right created at common law and based on principles of equity and fairness that entitles "an employer to use without charge an invention patented by one or more of its employees without liability for infringement." *McElmurry v. Arkansas Power & Light Co.*, 995 F.2d 1576, 1580 (Fed. Cir. 1993) (citations omitted). The Federal Circuit has further clarified that

> we believe that the proper methodology for determining whether an employer has acquired a "shop right" in a patented invention is to look to the totality of the circumstances on a case by case basis and determine whether the facts of a particular case demand, under principles of equity and fairness, a finding that a

"shop right" exists. In such an analysis, one should look to such factors as the circumstances surrounding the development of the patented invention and the inventor's activities respecting that invention, once developed, to determine whether equity and fairness demand that the employer be allowed to use that invention in his business.

*Id.* at 1581–82. The Supreme Court has similarly stated that

where a servant, *during his hours of employment,* working with his *master's materials and appliances,* conceives and perfects an invention for which he obtains a patent, he must accord his master a nonexclusive right to practice the invention. This is an application of equitable principles. Since the servant *uses his master's time, facilities, and materials* to attain a concrete result, the latter is in equity entitled to use that which embodies his own property and to duplicate it as often as he may find occasion to employ similar appliances in his business.

*United States v. Dubilier Condenser Corp.*, 289 U.S. 178, 188–89 (1933) (emphasis added) (citations omitted); *see also Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 563 U.S. 776, 784–86 (2011).

In less than a single page, Defendant claims that he has shop rights in Plaintiff's patents. [R. 104, p. 10]. He does so without a single citation to the factual record. *See id.* Defendant simply asserts that he "paid for the materials" used in the development of the collars, and that he took the collar to Scott and "hired her to work on prototypes." *Id.* The Court need not belabor why Defendant's undeveloped claims are both unsupported by and contrary to the overwhelming evidence in the record. Defendant did not pay for Scott's time or materials. [R. 104-5]; [R. 107-11]; [R. 107-3]. Scott was not Defendant's employee or otherwise hired by Defendant; Defendant was merely a customer. [R. 107-2, p. 8]. Scott developed the collars with her own time and effort, using her own facility, and paying for her own materials. *Id.*; [R. 107-3]; [R. 94-2, p. 3]. For many of the same reasons why Defendant has failed to raise any genuine dispute of a material fact concerning the alleged existence of an implied-in-fact contract, he has likewise failed in demonstrating a genuine dispute that he possesses shop rights in Plaintiff's patents.

### D.     Other Motions

Turning to the other pending motions, both Plaintiff's Combined Motions *in Limine*, [R. 97], and Defendant's Motions *in Limine*, [R. 98], concern the issue of expert testimony at trial on the issue of infringement. With the Court's finding of infringement in this ruling, this issue is moot and those motions will accordingly be denied. Similarly, Defendant's Motion for an Order Compelling the Parties to Mediate, [R. 110], is likewise denied as moot. Lastly, Plaintiff's Motion to Strike Defendant's Response to Motion in Limine and its Third Amended Response to Requests for Admission and for Sanctions, [R. 108], is largely moot as well, except potentially the issue of sanctions. Consequently, in light of the Court granting Plaintiff's Motion for Summary Judgment, [R. 94], the Court will deny this motion as moot and grant Plaintiff leave to refile a motion specifically addressing the issue of sanctions.

### IV.     CONCLUSION

For these reasons, the Court will grant summary judgment to Plaintiff as to the claims of patent infringement under both the '129 Utility and D'783 Design Patents in this action. Accordingly, and the Court being otherwise sufficiently advised,

**IT IS HEREBY ORDERED** as follows:

1.  Plaintiff's Motion for Summary Judgment, [**R. 94**], is **GRANTED**.

2.  Plaintiff's Combined Motions *in Limine*, [**R. 97**], Defendant's Motions *in Limine*, [**R. 98**], and Defendant's Motion for an Order Compelling the Parties to Mediate, [**R. 110**], are **DENIED** as **MOOT**.

3.  Plaintiff's Motion to Strike Defendant's Response to Motion in Limine and its Third Amended Response to Requests for Admission and for Sanctions, [**R. 108**], is **DENIED** as **MOOT** with leave to refile to specifically address the issue of sanctions.

Any renewed motion on the issue of sanctions shall be **filed within twenty-one (21) days** of the entry of this Order. Normal response and reply times apply consistent with the Local Rules. By allowing Plaintiff to refile this motion as a stand-alone motion, the Court makes no assessment of the merits of such motion.

4. The parties **SHALL** file a Joint Status Report by no later than **Monday, February 9, 2026**, advising the Court on any remaining issues in this case—including damages, a schedule for addressing any remaining issues, and any developments on settlement for those remaining issues.

This the 27th day of January, 2026.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY